## Allentown Bank *versus* Beck *et al.*

*Defendant in execution competent witness for claimant on interpleader issue.—Retention of real estate after sale, when not fraudulent.—Levy on personal property when unnecessary.— What irregularity will avoid judicial sale of personal property.—Sale of, when fraudulent in law.*

1. The defendant in an execution, under which goods previously sold to others, are levied on as his property, is a competent witness for the claimants, in an interpleader issue, framed as to the debtor's creditors, between them as plaintiffs and the execution-creditors as defendants.

2. The rule governing sales of personal property, that retention by the vendor, is fraud as matter of law, does not apply to sales of real estate, the title to which is governed by the conveyance as its index, and not by the possession: but fraud in the conveyance of the real estate alleged to have been conveyed fraudulently, is for the jury to determine as a question of fact.

3. Where the plaintiffs in the issue claimed title to certain personal property, under a prior sheriff's sale, when no other writs were in his hands, the want of actual levy and seizure under their writ, is immaterial, where it was immediately followed by a sale when the goods were in the actual power and control of the sheriff.

4. It is not a ground of legal fraud that the sheriff had given the adver-

tisements to the defendant in the execution to be posted, especially where there were many bidders at the sale : nor, that the plaintiffs in the execution purchased all the property, and that the prices were low, if the sale was public, without adverse levy or claim, and without remonstrance on the part of the defendant.

ERROR to the Common Pleas of *Northampton county.*

This was a feigned issue under the Sheriff's Interpleader Act, in which Thomas Beck and George W. Heiny, partners trading as Beck & Heiny, were plaintiffs, and the Allentown Bank defendant.

The material facts of the case, as disclosed on the trial, were as follows :—

Adam Hower was the owner of valuable real estate in the township of Lehigh, Northampton county, on which there was a mill, distillery, store, and tavern, and was there engaged in an extensive business as miller, distiller, storekeeper, farmer, and tavernkeeper. The Allentown Bank brought suit against him September 19th 1859, which was arbitrated. Shortly before obtaining the award, a large number of judgments were entered up against Hower, in the prothonotary's office of said county, upon amicable actions and confessions dated October 10th 1859. Four of these judgments were entered up November 30th, A. D. 1859, viz., one in favour of Beck & Heiny, the above plaintiffs, for $8000 ; one in favour of Thomas Beck for $9064.12 ; one in favour of Thomas Beck for $3100 ; and one in favour of Aaron Solt for $1000. The alleged consideration of these judgments was indebtedness to Mr. Beck and liability of Beck & Heiny as endorsers. The others, twenty-six in number, were entered up December 10th 1859 in favour of various creditors of Hower. December 12th 1859, a *fi. fa.* was issued upon the judgment of Beck & Heiny, and placed in the hands of Thomas Heckman, then sheriff, who made no levy under it, filled up six hand-bills from information given him by Hower, the defendant in execution, put up one in his own office and gave five others to Hower, but did not go to the place where the property was until the day fixed for sale (the store remaining open and sales going on as before), and sold goods and chattels to the amount of $2825.22, the plaintiffs in the execution being the only purchasers. Hower continued to live upon the property with his family, kept the tavern as before, and carried on the business of store, tavern, and distillery. There was no change of sign, although it was given out that the store business was in Beck & Heiny's name. Hower lived out of and from the store, tavern, mill, and farm without accounting or paying anything over to Beck & Heiny from the proceeds. No settlement was made with them, nor was any account of moneys kept by Hower, the title to the real estate, so far as the records showed, remaining unchanged. On the 15th of April 1863 the mill and distillery were destroyed by fire.

There was a neighbourhood meeting on the property, at which it was agreed to solicit contributions to assist Hower to rebuild the mill. Beck & Heiny were present. Subscriptions were ordered, and subsequently procured. To each was the following heading : " We, the undersigned, promise to give the sums opposite our names, to assist Adam Hower, Esq., of Howersville, Lehigh township, Northampton county, to rebuild his mill, which was destroyed by fire on the night of the 15th of April last," &c.

Upon one of the subscription books Thomas Beck subscribed twenty-five dollars. Upon another, George W. Heiny subscribed two hundred dollars, and paid the money to the collector, by whom it was afterwards paid to Hower. When the *fi. fa.* at the suit of the Allentown Bank was issued, June 12th 1863, Hower was in possession as above stated. The levy was made upon certain products of the farm and upon goods and chattels in Hower's possession on said property. He had $211.25 of these goods appraised to him under the Exemption Law. The residue, being those set forth in the feigned issue, were claimed by Beck & Heiny as their property, and this issue was directed to try their right to so claim as against the Allentown Bank, an execution-creditor of Hower.

On the trial of the cause, Beck & Heiny produced the deeds, dated in 1859, from Hower for his real estate, which had never been recorded. The consideration of these conveyances was stated to be $21,500, which was proved to be full value of the property, and Hower, on examination for plaintiffs below, under exception, stated the nature of a verbal contract between him and Beck & Heiny, under which he claimed that he had remained in possession and enjoyment of all the properties as before. On cross-examination he testified that " he did not receive any money at the time he delivered the deeds; received no papers from either Beck or Heiny the day he delivered the deeds; that no agreement was made the day he delivered them, but had been before ; no credit given on any paper at the time that he gave the deed to Heiny in Hower's house, and took Beck's deed to him ; that no credit was endorsed on Beck & Heiny's judgment or on Beck's judgments; that nothing was said as to how the balance over the liens, which were before Beck & Heiny's judgment, was to be distributed on the judgments in favour of Beck & Heiny, Beck and Solt; and that the judgments were all entered on the same day and were yet open on the docket." Hower further said on cross-examination : " Beck said if I would go away they would have nothing to do with it. I must look out for myself. If I stayed they would try to help me." Beck produced in court the notes given him by Hower, alleged to be part consideration of his judgment but without credit or payment endorsed.

The property sold to Beck was subject to two mortgages for

$6700 and a judgment for $6000. The property sold to Heiny was subject to a mortgage for $1200 and a portion of the above judgment. They were " to pay these liens as far as it would reach." No witness testified to having seen these deeds after their execution, or that Beck or Heiny had ever claimed ownership of the real estate before July 1863, nor was there any evidence that they ever denied being owners. There was proof that they were in the habit of visiting the property·frequently, and had made brick there to rebuild the mill, some of which were included in the issue.

Under this evidence, the defendant requested the court to charge the jury,

1. Unless plaintiffs have established a clear *bonâ fide* ownership of every article of property set forth in the issue, defendants are entitled to recover for what has not been so established.

2. If the goods levied upon, or any of them, were at the time of the levy in possession of Adam Hower, the law conclusively presumes that they belonged to him, in the absence of clear and satisfactory evidence to the contrary.

3. The sale of Hower's goods by Sheriff Heckman· in the way made, under plaintiff's directions, no previous levy, no closing of the store before sale, sold in large quantities, the plaintiffs the only bidders, completed for so much property in the short time it was, and at the prices bid, far below their real value, followed by Hower's continuing in possession of the property in the way proved, without change of sign, the store, tavern, and farm all apparently carried on by him as before, Hower living out of and from the store, tavern, and farm, without account, paying his own debts out of the store and acting with and towards the property as proved, coupled with the testimony as to the manner of signing the confessions of judgments, and their entries in the prothonotary's office, make the sales to Beck & Heiny (if even they had honestly paid for them) fraudulent and void in law as to the creditors of Adam Hower.

4. Under the facts here proved, plaintiff's alleged ownership of these goods and property would be a fraud in law without regard to the intent of the parties.

5. An attempted sale by Hower to plaintiffs with a reservation for his own benefit, would avoid the same in law as against his creditors.

6. Concurrent possession of property by Hower and plaintiffs would not protect such property from the creditors of Hower.

7. The alleged sale of Hower's real estate to plaintiffs, no money having been paid down, no credit given at the time upon plaintiff's obligations against Hower for the alleged consideration, no notes or obligations surrendered up, no agreement or guaranty made by them to keep Hower clear of other liens, and under and with the concurrent and surrounding facts proved,

gave no title thereto as against Hower's creditors, and Hower continuing to farm the land and use it, the crops raised by him, and the bricks, &c., made thereon, levied on by defendant, must be held in law to be his, and liable to the executions of his creditors.

8. The fact of Beck & Heiny subscribing to make up the loss of the buildings on this property by fire, for Hower's benefit, and in subscription books with the printed statements and declarations therein, as proved and shown, and paying money on their subscription to be paid to Hower, is evidence against their ownership of this real estate, estopping them from asserting the same, and therefore, under the evidence, they cannot recover for what was raised thereon, or made therefrom, as their property.

9. If the sales of any of Hower's property to plaintiffs known to them was made to hinder, delay, or defraud Hower's creditors, such sale was void in law, and passed no rights or title as against Hower's creditors, even though·made for full and valuable consideration.

10. Retention of possession of the land by Hower for four years after the execution of these deeds, which were delivered in secret, never recorded, but handed over to plaintiffs under the circumstances and in the manner proved, followed up by their declarations in writing and otherwise that the mill and distillery belonged to Hower, and with the other facts proved in the cause, made the products of the land liable to Hower's execution-creditors, and these secret conveyances given in evidence would be fraudulent in law as against such execution-creditors as the defendant.

11. These deeds from Hower to Beck & Heiny, under the evidence given and facts and circumstances proved, are inoperative as against defendants as execution-creditors of Hower, and establish no right as against them in plaintiffs to any of the property set forth in the issue.

The court below (MAYNARD, P. J.) charged the jury as follows :—

" This property had been levied on as the property of Adam Hower, upon a *fi. fa.* against him in favour of the Allentown Bank, the defendant in this issue. The property is claimed by the plaintiffs as their own.

" The defendant alleges that the property in question was owned by Adam Hower at the time defendant's execution was levied, and that the transfer of the same, as given in evidence in this case, from Adam Hower to Beck & Heiny was fraudulent as against the defendant as a creditor of Adam Hower. This allegation of fraud is the principal question you are to determine.

" If the title to this property was in Adam Hower at the time of the *fi. fa.* in favour of the Allentown Bank on which it was

levied was delivered to the sheriff, the defendant is entitled to a verdict.   If, on the contrary, the title to the property was vested in Beck & Heiny at the time that *fi. fa.* was placed in the hands of the sheriff, the plaintiffs are entitled to a verdict.

"If the personal property mentioned in this feigned issue, which had been owned by Adam Hower, was transferred by him to the plaintiffs for the purpose of delaying, hindering, or defrauding the creditors of Adam Hower, of which the Allentown Bank, the defendant, was one, a title so acquired would be fraudulent and void.

"If, on the other hand, such property was transferred by Hower to Beck & Heiny, *bonâ fide* for a full or fair consideration, and not for the purpose of hindering, delaying, or defrauding the creditors of Hower, such transfer, by whatsoever mode or manner it was made, would vest the title to the same in the plaintiffs.   And your verdict must be for the plaintiff or defendant, as you find these facts to which I have called your attention.

"It is clear from the evidence that Adam Hower was largely indebted as early as 1859, and to insolvency as presumed from the evidence, a large number of judgments were entered against him, amounting in the aggregate to more than $40,000.   The court are requested in substance by the counsel for the defendant to charge the jury that the transfer of the personal property in controversy in this issue to Beck & Heiny, and also the conveyances of the real estate to them by Adam Hower, were fraudulent and void in law *per se.*

"We decline to take the facts from the jury and to instruct them that this transaction between the parties, under all the evidence and circumstances attending it, was fraudulent *per se.*

"But we instruct the jury to take into their consideration all the facts and circumstances which have been given in evidence, and, if they find from this evidence that the transfer and conveyances were made for the purpose of hindering, delaying, or defrauding the creditors of Adam Hower, it will be your duty to pronounce it a fraud in fact, and return a verdict in favour of the defendant."

(The court here referred to and read the evidence to the jury.)

"The counsel for the defendant has presented to the court eleven voluminous points, on which he requests the court to charge the jury.   These are pretty fully, and, as the court think, sufficiently answered in our short general charge.   They embody but two questions—fraud in law and fraud in fact."

The court here read the defendant's points severally to the jury, and answered the same as follows:—

"The first and second points we answer in the affirmative, as requested.

"The third point.   We decline giving the instruction prayed for, but instruct the jury to determine, from all the evidence in

the cause, whether the sale from .Hower to Beck & Heiny was fraudulent in fact or not.

" We give the same answer to the fourth point which we have given to the third.

" The fifth and sixth points we severally answer in the affirmative.

" We decline to give the instructions prayed for in the seventh point, but instruct the jury that if the sale of the real estate was *bonâ fide* made by Hower to Beck & Heiny for a full consideration, that the manner in which the sale was made, and the continuance of Hower in possession or on the premises as hired agent and employee of Beck & Heiny, as testified to, would not be fraud in law,· but if such sale was not *bonâ fide* made as stated, it would be a fraud in fact.

" We give a·negative answer to the eighth proposition of the defendant. The facts set forth in this point, if proven, would not estop the plaintiff from claiming the ownership of the property.

" The ninth point we affirm—such is undoubtedly the law.

" The tenth point we decline to answer in the affirmative as requested, but leave for the jury to find whether the sale of the land, under all the circumstances attending it, was fraudulent in fact or not.

" We also give the same answer to the eleventh point as we have given to the tenth.

" This short charge embodies all the principles involved in this case. Adam Hower was indebted to insolvency. Did not put his name on paper because he considered it of no use. He had a tavern, store, quantity of store goods, grist-mill, distillery, and farm of some ninety odd acres. Was thus situated in 1859. While thus circumstanced, Beck & Heiny had an execution issued, and, by virtue of an execution placed in the hands of Sheriff Heckman, the property in this store was sold and bid off by Beck & Heiny. It is alleged by defendant that when this execution was placed in the sheriff's hands no actual levy was made. It seems to have been so. There was a memorandum given the sheriff by Hower of what was to be levied and sold. Without going to the property, the sheriff took the statement of the defendant of what his property was. He (the sheriff) put up one advertisement of sale. Hower took the others on the day of sale. Sheriff Heckman went up, and went through the sale as testified. As far as relates to plaintiff and defendant in that execution, their acquiescing in such sale would be good. As far as relates to other execution-creditors having executions, that might be different. But it does not appear that there were any other execution-creditors at that time, and that question does not enter into the case. But we leave it to the jury to say

whether the sale thus made was all a contrivance against the other creditors of Hower. If Beck & Heiny had a *bonâ fide* judgment and execution, &c., so far as plaintiff and defendant are concerned it would be binding just the same as a private sale. But, even as a private sale, it would be good as between them and Hower." [The court here referred to and read the testimony.] "These circumstances did not make it fraudulent, and so far as the parties to the sale were concerned it would be good. It was an informal sale merely. But mere informality does not vitiate. If this judgment was not good, not founded on a good consideration, it would be fraudulent. There is no evidence that the judgment was not good and sufficient, and it is not pretended that the judgment was not for a good consideration. The property sold remained in store. Same clerks, same owner apparently in charge, and no visible change of possession.

"And this brings before us the cases spoken of by the defendant's counsel where there is no change of possession. In order to relieve the case from that embarrassment the deeds were given in evidence for the property on which the store stands, &c., one deed to each of the plaintiffs for different parcels of the land. These were given in evidence to show a change of the possession, for any other purpose immaterial, except to show that a change of possession was immediately effected. That is a controlling point in cases of the kind which takes it from the court as a question of law and gives it to the jury as a question of fact. These deeds have been given in evidence, and purport to have been executed for a consideration. · The deeds on their face appear all right and fair. It is alleged that the deeds were executed for a consideration less than the value of the land, and two or three witnesses called by defendant say the consideration mentioned is less than the value. If this were true, the deeds would not be void for that. It is alleged by the defendant that the consideration was not paid. Hower said in his testimony no money was paid. That would not make the deeds void. If, as said by plaintiff, that the consideration of these deeds was based upon Hower's indebtedness to Beck & Heiny, and was also subject to the mortgages. Is this true? Was the deed executed upon good and sufficient consideration? If good, was there a change of possession? Upon that we have the testimony of Hower. He had appointment as steward of poor house (reads the testimony). They (Beck & Heiny) had a perfect right to make such a contract with Hower, if it was truthful; they might as well employ Hower as any other person, and he had a right to go in possession, and the whole contract, if not made for a cover, would be *bonâ fide* between the parties. The deeds were not recorded. It is always in good taste to put deeds on record. Parties run risks if they do not. But it is not a

13 Wr.—26

necessity. Then the question recurs whether this was a fictitious arrangement and Hower kept there under it. We are asked to pronounce the deeds fraudulent. But we do not and will not take the facts from the jury, and that question can be tried otherwise, by issuing execution and levying on the land, ·and trying the title by ejectment. We will not take the facts from the jury. If this arrangement was made to keep Hower in possession in defiance of his creditors, it would not do. One controlling question is the *bonâ fide* consideration of the judgments. Is there any evidence to satisfy you that Hower was not indebted to plaintiffs? When a transaction is based on a good consideration and untainted by fraud, the law sustains it, and when it is based on a past consideration, as between debtor and creditor, there is no room for impeaching it unless greatly inadequate. A debtor can give a judgment or deed to creditors in security or payment of the indebtedness. Indebtedness ought to be paid. There are higher equities with some creditors. For instance, a man who had sold property to his debtor at three times its value ought not in equity to be preferred to a widow who had loaned him all her money without security. It is the impulse of the heart to pay in preference the more meritorious. The law would be a tyrant and robber if it did not permit a preference ·in payment. A man may thus prefer one creditor to another. The plaintiffs here might be preferred; and if the jury find all right, all honest, they ought to save them. But otherwise, not. They have taken possession and exercised ownership.

"It is alleged by defendant that, after the mill was destroyed by fire, an arrangement was made for rebuilding it, and in that it was acknowledged that this property was Hower's." [The court here referred to and read the subscription books.] "These were produced to show admissions by plaintiffs. They might admit enough to show that the deeds were not intended to pass the property. But it is said on the other side that the matter was discussed and put as a question of policy, and a move of the friends of Hower who wanted the mill rebuilt, and that this printed heading in the books was done because Hower was popular and had lost money, and had the sympathy of the community, and they thus account for Beck & Heiny's putting their names on these lists as they did.

"It would be natural that the subscribers would wish to accommodate him, and I don't think that Beck & Heiny putting their names there would do away with the deeds. This brings in view of the jury all the questions."

The court here read the points put by plaintiff's counsel, seven in number, and answered them severally in the affirmative, and concluded as follows :—

"We have thus gone over the facts, and called the attention of

[Allentown Bank v. Beck et al.]

the jury to the evidence. The facts are entirely for the jury. The law must be received from the court. If the jury do not take the law from the court, the parties are remediless except by motion to set aside the verdict and grant a new trial."

Under these instructions there was a verdict and judgment in favour of plaintiffs. Whereupon defendant sued out this writ, and assigned for error the admission of Adam Hower as a witness, the admission in evidence of the deeds from Adam Hower to Thomas Beck, and Adam Hower to George W. Heiny, dated December 9th 1859, and the ruling of the court in the charge of the court below, and in the answer to the points above mentioned.

*H. D. Maxwell* and *M. H. Jones*, for plaintiffs in error, argued that the arrangement between Hower and Messrs. Beck & Heiny was contrary to public policy and fraudulent in law; that the deeds were not intended as *bonâ fide* conveyances but only to be used as Hower's benefit required and had the effect to hinder his creditors and keep them from interfering with his possession and enjoyment; that being signed and delivered without payment of any consideration or surrender of any obligation held by the vendor against Hower or any endorsement of credit on them, they were inoperative as against creditors, and passed no title to the land or any of the products of the farm included in the levy of the bank.

That the whole possession of the property by Hower was inconsistent with an ownership by Beck & Heiny, and fraudulent in law against the bank.

That the sheriff's sale of Hower's store goods to Beck & Heiny without previous levy and legal advertisement, was not in proper terms a judicial sale, and contended that where property is sold by a debtor and possession retained, such sale is void as against the policy of the law, and the property liable to be taken in execution by a creditor of the debtor: citing Wilt v. Franklin, 1 Binn. 502; Dawes v. Cope, Id. 428; Clow v. Woods, 5 S. & R. 275; Cunningham v. Neville, Id. 201; Babb v. Clemson, 10 Id. 419; Shaw v. Levy, 17 Id. 99; Streeper v. Eckert, 2 Whart. 302; Welsh v. Beckey, 1 Penn. 61; Jenkins v. Eichelberger, 4 Watts 121; Carpenter v. Mayer, 5 Watts 484; Young v. McClure, 2 W. & S. 157; Cadbury v. Nolen, 5 Barr 326; Hoffner v. Clark, 5 Whart. 545; Milnes, Brown & Co. v. Henry, 4 Wright 352; Brown v. Keller, 7 Id. 105.

That the continuing in possession by the vendors is a fraud *per se*, and not merely evidence of fraud. And being considered a fraud in law without regard to the real intention of the parties, it becomes a question for the court, and not for the jury, to decide: Carpenter v. Mayer, 5 Watts 485. In the cases above

[Allentown Bank *v.* Beck *et al.*]

referred·to, 5 S. & R. 275, 10 Id. 201, 419, 1 Penn. 61, 4 Watts 121, 5 Id. 484, 2 W. & S. 147, 5 Whart. 545, 4 Wright 352, and 7 Id. 105, the courts took to themselves the decision of the cases, declaring the facts to show fraud in law. In Hoffner *v.* Clark, 5 Whart. 545, the Supreme Court decided that the court below erred in leaving the question to the jury.

That the case of The York County Bank *v.* Carter, 2 Wright 446, only decided that "a debtor may lawfully sell his property in consideration that the purchase-money be paid to some of his creditors to the exclusion or postponement of others, if it be done without any fraudulent design and is a present application of his property to the payment of his debts." That there was a written agreement executed by the vendee to pay these creditors, naming them, amounting to $114,500, including a debt of $12,000 alleged to be due to him, and under the bills of sale and deeds the vendee took the formal and actual possession of the mines and movable chattels, and from that time worked and managed the mines on his own account, and after the purchase proceeded to pay off the indebtedness which he had assumed and settle with the creditors generally.

But in this case no money consideration was paid, nor any written agreement as to the alleged assumption of the previous encumbrances. No agreement or understanding how the balance of $5000 was to be divided on the judgments given to Beck. The proof of the existence of the agreement depended solely upon Adam Hower's life. If he died, the receipts on the deed showed a money consideration paid in full, and there would have been no evidence left. No evidence was given on the trial that these grantees had paid these liabilities. The records were in the recorder's office and prothonotary's office. There was no allegation that any of these encumbrances had been satisfied or paid. None of the creditors called to show their acquiescence in or satisfaction with any arrangement or knowledge of it. No guaranty given or made to keep Hower clear of these liens or prevent his other property being sold under them.

But besides this, these plaintiffs openly, publicly, and under their own hands, repudiated these deeds and any ownership of this land in the summer of 1863, when the meeting of the neighbours was held in relation to the fire, and when they subscribed to the loss, declaring, as the headings of the subscription did, that this property was Hower's.

"A party may be as effectually estopped by matter *in pais* as by matter of record, and he is not permitted to controvert what he himself has directly asserted:" Heitzman *v.* Divil, 1 Jones 268, referring to Goodman *v.* Losey 3 W. & S. 526; Martin and Others *v.* Iveis, 17 S. & R. 365; 1 Greenl. Evidence, § 22;

[Allentown Bank v. Beck *et al.*].

Crowell *v.* McKonky, 5 Barr 168; M'Mahan *v.* M'Mahan, 1 Harris 380; Carr *v.* Moltz, 10 Barr 530.

If the agreement, as Hower details it, was made for the benefit of himself and family, that would make these deeds, without aught else, fraudulent and void as to creditors : Passmore *v.* Eldridge, 12 S. & R. 198; McClurg *v.* Lecky, 3 Pa. R. 91.

*B. F. Fackenthall* and *H. Green*, for defendants in error.—I. The complaint of plaintiff in error is, that the transactions between Beck & Heiny and Hower have not been declared a fraud.  The tribunal whose especial function it was to pronounce upon such questions has decided against them, and they are without remedy unless this court can be induced to assume the functions of a jury, and judicially declare that, upon all the evidence in the cause, there was an intent to hinder, delay, and defeat the Allentown Bank.  The court below refused to do this, referring the whole question to the jury.  Still dissatisfied, they propose that this court shall do what the jury and Common Pleas declined doing, and pronounce a judgment upon the facts, providing it be a judgment in their favour.  Conscious that this court only decides legal questions, they strive at some stages of their argument to give the question the aspect of a legal one by proposing that all the facts, taken together, shall be held to constitute a fraud in law.  This inconsistency becomes manifest the moment one examines the argument in detail.  The expression *fraud in law* is applicable to the case of a retention of possession of chattels by a vendor who has sold them by a private sale to another. The legitimate scope of the argument would be to show that there was such a retention of possession in this case.  But our friends are not content to pursue this line of argument.  They argue the entire question of a fraudulent intent in the parties, which is a pure question for the jury; and they enumerate all the facts, real and imaginary, which, in their view, indicate the presence of a design to hinder and delay their client.  We cannot think that the court will entertain that sort of argument.

The only vital proposition on behalf of the plaintiffs is, that there was fraud in law.  In support of this the counsel argue that there was a retention of possession by Hower of the chattels formerly owned by him, so that they were liable to seizure by his creditors.  To this we answer that the goods were sold to us by the sheriff at a judicial sale, therefore Hower's apparent retention of possession is not fraudulent in law : Meyers *v.* Harvey, 2 Penna. Rep. 481.  But the plaintiffs in error respond to our reply by saying that the sheriff's sale was void for informality; which alleged informalities are, that there was no sufficient levy, no proper advertisement, and that the goods were sold in too large quantities.

[Allentown Bank *v.* Beck *et al.*]

1. As to the levy. Sheriff Heckman made his levy by obtaining from the defendant a list of the goods, which he adopted as correct and treated as his levy. He did not go to the place where the goods were on the day he made it, and not until the the day of the sale, seven days after. The *fi. fa.* was issued on December 12th, and the sale was had on December 19th. The control and custody of the sheriff were almost immediately asserted by the sale, and even if another execution had intervened, Beck & Heiny's writ would have taken the money. It has nowhere been held that a levy in such circumstances was not sufficient, much less has it been held that such proceedings under a *fi. fa.* would be entirely void, so that no title would pass by the sale: Wood *v.* Vanarsdale, 3 Rawle 401, 405.

In this case the goods were in a remote part of the county, some twenty miles from Easton. It was in the midst of winter, and no communication except over the country roads. No other *fi. fa.* was in the sheriff's hands, and he advertised the sale to take place in seven days after he received the writ. This itself was an assertion of his control and his levy. And he followed up his *fi. fa.* immediately with an actual public sale under it with all the due and customary formality. See Wilson, Sieger & Co.'s Appeal, 1 Harris 429; Shafner *v.* Gilmore, 3 W. & S. 438; Schuylkill County's Appeal, 6 Casey 358.

2. As to the advertisement. The law presumes that this was duly made. There is no proof to the contrary. The hand-bills were all printed. One was put up by the sheriff. The others were delivered to the defendant to be put up in the vicinity of the goods. The sheriff chose to make the defendant his agent for this purpose, and he had a right to do so. The legal presumption is that the bills were put up; and it was testified by Sheriff Heckman and his deputy that the sale was the largest in its attendance they ever held.

3. It is said the goods were sold in bulk, or rather in too large quantities, and the sale therefore void. In support of this the case of Klopp *v.* Witmoyer & Arentz, 7 Wright 219, is cited, but it is an authority in our favour. Hower's goods were not sold in mass, nor at one bid, nor in a few minutes. Nor is there a spark of evidence that either Beck & Heiny or their counsel, or Hower interfered in any manner whatever with the sale, or gave any directions respecting it. The property was not sold by the shelf, but a lot together at so much a yard, put up by the piece with the privilege of taking all the same kind of goods. The hardware was sold by the shelf. The same with the earthenware and crockery in different parcels. The contents of the cellar were not sold together. The sheriff was more than eight hours selling the stock.

The sale was confirmed by the defendant in the execution, and

no one else contested it. The plaintiffs in error had the right to do so, but never exercised the right. When Klopp v. Witmoyer, 7 Wright 226, was tried a second time, it was held that although the sheriff's sale was void in law and passed no title, yet as it had been ratified by the defendant in the execution, the plaintiffs could hold the property sold, even as against the creditors of the defendant. The entire residue of the argument for plaintiffs in error is an effort to show fraud in fact.

It is true, they say this retention of possession was fraudulent in law, but with the exception of the alleged invalidity of the sheriff's sale, which is a question by itself, they attempt to establish this asserted legal fraud, by arguments, to show fraud in fact. The authorities cited all relate to private sales and are unquestioned. We refer, on the subject of the change of possession, to the remarks of this court in the cases of Hugus v. Robinson, 12 Harris 10, and Chase v. Ralston, 6 Casey 539.

Our third and fifth points cover all the essential features of the case, and commit the entire question to the jury as one of fraud in fact. They were framed upon the decisions of this court in the cases of Meyers v. Harvey and The York County Bank v. Carter, 2 Wright 446; the latter of which cases was very analogous to the present in many of its circumstances.

II. Stress is laid upon the fact that Beck & Heiny had not recorded their deeds. This also was exclusively for the jury, and is a very slight circumstance at best, but even it was explained by the declaration of Beck that he was not in the habit of recording any of his deeds. They were also impeached because executed in secret. The truth is, they were acknowledged before a magistrate, and attested by him and another witness. It is also urged that Hower and his family lived out of the business, keeping no account of their expenses. This also was exclusively for the jury, but even this was explained by the testimony that it was part of the contract upon which he remained. And so of every other objection.

III. It is argued that Beck & Heiny are estopped from asserting their ownership of the land by this: The mill and distillery with their contents were destroyed by fire in April 1863. After the fire a meeting of the neighbours was held for the purpose of taking measures to raise money to contribute towards the loss. A committee of thirteen was appointed to report a plan. The committee met, and in the course of their deliberations it was suggested that more money could be raised if the subscription lists were made out in the name of Hower than in the names of Beck & Heiny. The committee adopted this idea, and directed the lists to be prepared accordingly. This was done. Neither Beck nor Heiny nor Hower had anything to do with this arrangement. It was the pious device of sympathizing friends alone.

[Allentown Bank *v.* Beck *et al.*]

When these lists were circulated, one of the collection agents, Frederick Horn, testified: "I commenced with Beck; told him his neighbourhood had subscribed; told him all the neighbours subscribed, he should too; that I would have him on the list; I told him it would not look well if he would not subscribe too." Beck, thus importuned, made a small subscription. Some of the money collected was paid to Heiny, who signed a receipt for it, not written by himself, in which the treasurer describes himself as "treasurer of the collectors, appointed by a committee for the loss of Adam Hower's mill and distillery." And these signatures are claimed to estop Beck & Heiny from setting up their title to the whole of this real estate. There is not a solitary element of estoppel in this whole transaction. In the first place, this assertion of title in Hower (supposing it to arise to that dignity) was never made to the Allentown Bank at any time, either before or after they obtained their judgment. There is no evidence that any officer of the bank ever saw these lists. Second. They never advanced a penny upon the faith of the assertion, nor based any action upon it of any kind. Third. Their position will not be in the least changed by our assertion of our own title; and Fourth. The alleged estoppel is not mutual. The bank would not have been bound if the lists had asserted the title to be in Beck & Heiny.

But the whole tenor of the charge is complained of. This is indefinite. The court will see that the law was fully and carefully explained to the jury; and every circumstance relied upon by the plaintiffs in error was submitted fairly and impartially.

IV. Counsel admit that this court has directly decided that the defendant in an execution is a competent witness for the plaintiffs, in an issue under the Interpleader Act, and offer no reason why that decision should be reversed. We see no occasion for any argument under this bill. Nor can we conceive of a solitary reason why Mr. Hower is not competent.

V. Why the deeds were irrelevant we cannot understand. They showed title to the land on which the grain in controversy was growing.

The opinion of the court was delivered, May 15th 1865, by

Agnew, J.—This case is simple in fact and not much varied in detail; yet twenty-nine errors are presented for our decision. It is possible the excellent judge who presides below might make twenty or thirty mistakes in the course of a single trial; or if not, that the eminent counsel might have supposed so; but the probabilities of so many errors are so few, it would seem much more likely that a court of error would listen patiently and examine carefully the few questions presented by the case, than

[Allentown Bank *v.* Beck *et al.*]

that they should exhaust themselves in a vain endeavour to cover the whole ground of complaint.

With these observations we may dispose of the numerous assignments of error by saying, that after a patient examination of all, we discover nothing in any to justify a reversal of the judgment. The case appears to have been well tried, and the real questions submitted to the jury. Adam Hower was no party to the feigned issue, and his interest, if preponderating either way, was adverse to the plaintiff; for it tended to take from beneath the defendant's levy, property which went to the payment of his debt, while if the plaintiffs failed they could have no recourse to him.

The main ground urged by defendant was that the rule governing sales of personal property should apply to real estate. But the title to real property is governed by the conveyance as its chief index, and not by the possession. Whatever effect the retention of possession may have in a question of actual fraud, it is clear it has no place as the governing rule in questions of legal fraud, except as between purchasers from the same vendor in possession in the case of an unrecorded secret conveyance. The court was therefore clearly right in submitting the question of fraud upon the conveyances of the real estate to the jury as one of fact, and not a fraud in law.

Whether the sheriff's sale of the personal estate in 1859 was fraudulent, was also a question of fact. This was not a controversy between rival executions levied on the same property, or a purchase without notice of the levy, raising a question upon the legality of the levy. Admitting no actual seizure of Hower's property was made by the sheriff on Beck & Heiny's writ, it is clear that when the sale took place, it was in the actual power and control of the sheriff, who in point of fact sold and delivered it, at a time when there was no conflict of title or possession. The sale was not in a lump, but by parcels, and in the presence of many persons, the evidence showing that an unusually large concourse attended the sale.

The fact that the advertisements were given to the defendant in the execution to be posted is not, in itself, a ground of legal fraud, while the strong presumption, arising from the large number of bidders, is, that he had faithfully done his duty by posting them in public places.

The fact that the plaintiffs in the execution purchased all the property, and that the prices were low, cannot be looked upon as a badge of legal fraud, though they are circumstances of weight in the question of fraud in fact. The property was publicly sold and delivered by a public officer, upon a legal writ, without adverse levy or claim, and without remonstrance from the defendant in the execution. It went into the actual possession of the

plaintiffs in the writ as the purchasers who carried on business upon the real estate conveyed to them in their own names, thus opening accounts and buying and selling from 1859 until 1863, when the levy of the Allentown Bank was made, not upon the identical grain, hay, lumber, &c., but upon the productions of the property coming into existence subsequently. Excepting the buggy and some portions of the stock of merchandise in the store (and what portions were neither identified nor estimated), the personal estate levied in 1859 had been used and disposed of. It was clearly not a case where these badges of fraud existed, following the identical property, and singling it out for pursuit, upon which the law would seize and pronounce it a legal fraud, such as would subject it to the claims of other creditors.

The court therefore properly submitted the real questions, which were of fact, to the jury, whose verdict is to be taken as conclusive of the matters established by it.

The judgment is affirmed.